FILED

06/19/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 24, 2020

## STATE OF TENNESSEE v. CHARLES BERNARD GRIFFIN

**Appeal from the Criminal Court for Knox County**
**No. 114209   G. Scott Green, Judge**

_____

### No. E2019-00969-CCA-R3-CD

_____

The Defendant, Charles Bernard Griffin, appeals his convictions for especially aggravated robbery and possession of a firearm while having a prior felony conviction involving the use or attempted use of force, violence, or a deadly weapon, for which he received an effective sentence of seventy-five years as a career offender. On appeal, the Defendant challenges the sufficiency of the evidence and the trial court's denial of his motion to bifurcate the trial. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT L. HOLLOWAY, JR., JJ., joined.

J. Liddell Kirk (on appeal) and Daniel Morrell (at trial), Knoxville, Tennessee, for the appellant, Charles Bernard Griffin.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme Allen, District Attorney General; and Phillip Morton and Ashley McDermott, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

According to the evidence presented at trial, on June 8, 2017, the Defendant entered a Dollar General store in Knoxville, Tennessee, while wearing a hoodie, covering the lower portion of his face with a shirt, and holding a gun. He pointed the gun at Mr.

Ahmad Elasmar, the victim and the store's manager, and motioned for the victim to open the cash register. The Defendant beat the victim on his head and face with the gun, causing multiple injuries. The Defendant then grabbed the cash drawer from the register and fled. He was arrested approximately one year later.

The victim testified that he was serving as the cashier on the morning of the robbery. He was ringing up purchases for two young men when the Defendant entered the store with his mouth covered and holding a gun. The victim believed the Defendant was going to shoot him. The Defendant used his gun to motion the victim to move to one of the cash registers and open it. The victim told the Defendant that there was not any money in that particular cash register, and the victim walked to another cash register and began opening it. The Defendant walked to the other side of the counter and stood next to the victim. As the victim was opening the cash register, the Defendant struck him in his eye with the gun. The victim described the Defendant's striking him as "very painful" and similar to the level of pain felt when experiencing a kidney stone. The victim stated that he tried to stay on his feet and give money to the Defendant so that the Defendant would leave. The victim was scared because children were in the store. The victim told the Defendant that he was opening the cash register to get the money for the Defendant. The Defendant struck the victim a second time, and the victim did not recall anything else that occurred after the second strike. The victim did not know what happened to the cash drawer from the register.

The robbery was captured on the store's video surveillance system, and the recording was played for the jury. The recording showed the victim at a cash register with two younger men on the other side of the counter. A man who was covering his head with a hoodie and the lower portion of his face with a shirt and was holding a gun came into view. The man used his gun to motion the victim to a cash register. As the victim was opening the cash register, the man approached the victim from behind and stood extremely close to the victim. The victim turned and looked at the man multiple times. The man hit the victim around his face and head with the gun, knocking the victim down. The victim got up and was attempting to open the cash register when the man struck the victim again on his head and face with the gun. The victim fell and got up, but the man hit him with the gun multiple times around his head and face. As the victim was lying on the floor, the man grabbed the drawer from the register and fled. The victim then got up and ran down one of the aisles, which the victim testified led to a back room where an exit was located. He stated that he was trying to hide because he believed that the Defendant was going to shoot him. According to the recording, the encounter lasted approximately two minutes.

The victim recalled calling 911 but could only vaguely recall speaking to the operator. The recording of the victim's call was played to the jury. The victim reported

that he had been robbed and that he was struck with a gun, was bleeding, was having trouble speaking, and needed an ambulance. Another recording of a 911 call placed by someone who identified himself as "Jerry" was played to the jury. The caller reported that the Dollar General was being robbed by a man wearing a gray hoodie and holding a black handgun. The caller described the perpetrator as an African-American male, who was approximately five feet, eight inches tall, was in his late twenties or early thirties, and had either very short hair or no hair. The caller reported that the perpetrator "pistol whipped" an employee.

The victim testified that he sustained painful injuries to his eye, mouth, and jaw. He lost a few teeth, and his upper jaw was broken. He remained hospitalized for three days and underwent surgery to install a metal plate and screws in his cheek and a wire across his mouth. The wire remained for approximately one month during which the victim was unable to eat solid food. He was unable to work for two months. A bridge and crowns had to be inserted to replace his missing teeth. Following his release from the hospital, he had follow-up appointments with a doctor for approximately one year. The victim continued to experience pain as a result of his injuries. He had to chew food on the left side of his mouth, and he could not do activities that he enjoyed prior to his injuries, such as gardening and yard work.

On June 14, 2017, eight days after the robbery, an investigator came to the victim's home and showed him a photographic line-up. Because the perpetrator's mouth was covered during the robbery, the victim covered the mouth of each person depicted in the line-up in an effort to identify the perpetrator by his eyes and nose. The victim identified the Defendant as the perpetrator in the photographic line-up and at trial. The victim explained that he was able to identify the Defendant at trial by his eyes and by the way that he walked. The victim noted that he had watched the Defendant while in court for the trial.

On cross-examination, the victim testified that he was approximately ten feet away from the Defendant when the Defendant first entered the store. Approximately twenty seconds later, the Defendant came around the counter. Although the Defendant was covering part of his face and wearing a hoodie, the victim was able to see his eyes. When the Defendant approached the victim from behind, the victim turned around to see what he wanted and looked at him. The victim stated that he looked at the Defendant before the Defendant hit him and that the victim was "very close" to the Defendant. After the Defendant struck the victim the first time, blood went into the victim's eyes, and he could not see what the Defendant was doing with the cash register. The victim testified that he identified the Defendant as the perpetrator in the photographic line-up based upon the Defendant's eyes and nose. The victim explained, "I was confident when I looked at the

picture and covered the mouth….But, again, … the picture is not exactly what you see in real life. So I was hesitant but not hesitant enough to say, no, it's not him. It is him."

On redirect examination, the victim testified that he had no doubt that the Defendant was the person who attacked him. In response to questioning by the trial court, the victim stated that the drawer that the Defendant took as depicted in the recording contained money.

Mr. Ronald Smith, an employee at Dollar General, testified that on the day of the robbery, he was in the restroom when he heard a noise as if someone was crying out. He ran out of the restroom to investigate and saw a man pointing a gun at the victim. The man demanded money and pointed the gun at Mr. Smith. Mr. Smith fell to the floor, ran to the back of the store, and exited through the back door. As he was leaving, he saw a woman calling the police. Mr. Smith returned to the store once officers arrived.

Mr. Smith testified that he recognized the perpetrator as someone whom he had seen walking near his apartment on multiple occasions. Mr. Smith provided this information to police officers. He identified the Defendant as the perpetrator in a photographic line-up and at trial. On cross-examination, Mr. Smith stated that he saw the Defendant in the area of his apartment talking to someone "a couple of times." Mr. Smith last saw the Defendant either a few weeks or a few months prior to the robbery.

Officer Jason Cunningham with the Knoxville Police Department responded to the scene and interviewed witnesses. He spoke to two younger customers who were in the store at the time of the robbery. Once the perpetrator entered the store and brandished a weapon, the customers ran to the back of the store and did not see anything. Ms. Delores Williams, an employee, was working when she heard the commotion. She ran to the front of the store, saw someone with a gun, and immediately retreated. Mr. Smith, another employee, was able to provide a description of the perpetrator. Officer Cunningham recalled that the description that he was given was a short, African-American man with dark skin.

Officer Russell Whitfield with the forensic unit of the Knoxville Police Department was dispatched to the Dollar General Store where he took photographs of a broken portion of a cash register located in an alleyway behind the store. Change was scattered on the ground and eight one-dollar bills were inside the register. Officer Whitfield lifted smears and smudges of fingerprints from the register, but they were not identifiable prints.

Officer Whitfield entered the store where the sales counter was in disarray and had blood in the area. Blood was on the floor, the keyboard, and some change scattered in the

area. He took a photograph of a bloody footprint on the floor. He later photographed the bottom of the victim's shoes and determined that the impression was not made by the victim's shoes. A blood trail led from the front of the store to the back of the store. Officer Whitfield attempted to lift fingerprints from the sales counter and the store's glass doors. While he was able to lift some fingerprints from the doors, he was unable to determine to whom they belonged.

Investigator Jeff Day with the violent crimes unit of the Knoxville Police Department responded to the scene and spoke to the victim, who was in an ambulance. The victim reported that while he was working, a short, stocky African-American man entered the store and pointed a gun at him. The man then "pistol whipped" the victim, took the drawer of the cash register, and fled. Investigator Day was unable to conduct an extensive interview of the victim due to the victim's condition, and the victim was transported to the hospital.

Investigator Day reviewed the recording of the robbery from the video surveillance camera and interviewed two employees, Ms. Williams and Mr. Smith. Ms. Williams ran to the back of the store at the time of the robbery and was unable to identify the perpetrator. Mr. Smith told Investigator Day that he knew the perpetrator's identity but did not want to talk in front of everyone. Mr. Smith asked Investigator Day to return later that day, and Investigator Day agreed to do so. However, Investigator Day was unable to return to the store that day because he began investigating an unrelated homicide. He returned to the store four days later and spoke to Mr. Smith. Mr. Smith did not know the perpetrator's name but stated that he had seen the perpetrator multiple times in the housing development near Mr. Smith's apartment and in the store on a previous occasion. Investigator Day noted that Mr. Smith's apartment was located near the Dollar General store. Mr. Smith stated that a few nights before the robbery, the perpetrator was involved in an incident during which the police were called, and Mr. Smith identified the officer who responded to the incident.

Investigator Day researched police reports in the area and found a police report of a call on June 6, 2017, at 10:54 p.m. The reported listed the address of Mr. Smith's apartment, and the responding officer identified by Mr. Smith. The report concerned one woman and three men, including the Defendant, loitering at the edge of the parking lot in front of the apartment complex and drinking alcohol. One of the men was arrested on the night of the call and was in jail at the time of the robbery, so Investigator Day eliminated him as the perpetrator. A second man was six feet, four inches tall, had gray hair, and was sixty years old, so he did not fit the description of the perpetrator from the video recording of the robbery. The third man was the Defendant, who matched the description of the perpetrator.

Two days after speaking to Mr. Smith, Investigator Day prepared a photographic line-up that included the Defendant's photograph and showed it to Mr. Smith. Investigator Day testified that Mr. Smith identified the Defendant in the line-up as the perpetrator and did not hesitate in doing so. Later that night, Investigator Day showed the photographic line-up to the victim. The victim told Investigator Day that he primarily recalled the perpetrator's eyes and the top portion of his face, so the victim covered the mouth of each person depicted in the photographic line-up and identified the Defendant as the perpetrator. Investigator Day prepared a warrant for Defendant's arrest. Officers conducted surveillance of the addresses where the Defendant was known to stay but were unable to locate him. The Defendant was arrested approximately one year later.

On cross-examination, Investigator Day testified that the young customers were gone by the time that he arrived at the scene and that he did not have any contact information for them. He never attempted to contact "Jerry," who called 911. Investigator Day agreed that when he showed the photographic line-up to the victim, he indicated to the victim that he believed the perpetrator was in the line-up. Investigator Day acknowledged that when the victim was reviewing the line-up, the victim focused on two different photographs, going back and forth between the two. Investigator Day agreed that he told the victim multiple times that if he believed the photograph that he was viewing was that of the perpetrator, the victim should place an "X" beside the photograph. Investigator Day testified that no weapon was ever recovered and agreed that it usually was difficult to determine from a video recording whether a firearm is an actual firearm or a BB gun.

For purposes of the firearm charge, the parties stipulated that prior to June 8, 2017, the Defendant "had been convicted of a prior felony as described in TCA 39-17-1307(b)(1)(A)." After the stipulation was announced, the trial court instructed the jury, "I want to remind you once again, the fact that [the Defendant] has been previously convicted of another crime in no way impairs his presumption of innocence in this case."

The Defendant was charged with especially aggravated robbery, possession of a firearm while having a prior felony conviction involving the use or attempted use of force, violence, or a deadly weapon, and two counts based on the gang offense enhancement. The gang offense enhancement charges were dismissed, and the jury convicted the Defendant of especially aggravated robbery and the firearm offense. Following a sentencing hearing, the trial court sentenced the Defendant to sixty years as a career offender for especially aggravated robbery, and the trial court ordered the Defendant to serve one hundred percent of the sentence because he previously had been convicted of aggravated robbery. The trial court sentenced the Defendant to fifteen years as a career offender for the firearm charge to be served consecutively to his sentence for especially aggravated robbery, resulting in an effective sentence of seventy-five years.

The Defendant filed a motion for new trial, which the trial court denied. He then filed a timely notice of appeal.

## ANALYSIS

### I. Sufficiency

The Defendant challenges the sufficiency of the evidence supporting his convictions. When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

Especially aggravated robbery is robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. T.C.A. § 39-13-403(a). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). Regarding the firearm conviction, Tennessee Code Annotated section 39-17-1307(b)(1)(A) (2014) provides that a person commits an offense "who unlawfully possesses a firearm" and "[h]as been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon."

On appeal, the Defendant does not challenge the sufficiency of the evidence as it relates to the elements of the offenses. Rather, he maintains that the evidence is insufficient to establish his identity as the perpetrator. "The identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing *State v. Strickland*, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The issue of identity is a question of fact left to the jury as the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

The victim and Mr. Smith identified the Defendant as the perpetrator in a photographic line-up and at trial. The victim recognized the Defendant based upon the Defendant's eyes and nose. The video recording of the robbery showed the Defendant standing very close to the victim and the victim turning multiple times to look at the Defendant's face. Mr. Smith recognized the Defendant because Mr. Smith had previously seen the Defendant near his apartment on multiple occasions. Although Mr. Smith did not know the Defendant's name at the time of the robbery, Mr. Smith told Investigator Day that the perpetrator had been involved in an incident near Mr. Smith's apartment requiring police response two days prior to the robbery. Investigator Day located the corresponding police report and noted that the Defendant was involved and that he matched the description of the perpetrator as depicted in the video of the robbery. On appeal, the Defendant challenges the credibility of the testimony of the victim and Mr. Smith and the reliability of their identifications. However, issues regarding the credibility of a witness's testimony are resolved by the jury as the trier of fact. *See Bland*, 958 S.W.2d at 659. We conclude that the evidence, when viewed in a light most favorable to the State, is sufficient to establish the Defendant's identity as the perpetrator.

## II. Bifurcation

The Defendant asserts that the trial court erred in denying his motion to bifurcate the trial and to require that the firearm charge be tried after the jury rendered a verdict on the charge of especially aggravated robbery. The Defendant argues that a bifurcated trial was necessary to prevent the jury from learning that he had prior violent felony convictions and from considering those prior convictions in rendering a verdict on the charge of especially aggravated robbery.

According to the firearm charge in the indictment, the Defendant had two prior convictions for robbery, as well as prior convictions for aggravated assault, aggravated robbery, armed robbery, and possession of a firearm by a convicted felon. Prior to trial, the Defendant filed a motion to bifurcate the trial, arguing that trying the firearm charge

with the especially aggravated robbery charge would be "extremely prejudicial" because it would result in the presentation of evidence of prior convictions that would otherwise be excluded under Tennessee Rule of Evidence 404(b) if the Defendant was only tried for especially aggravated robbery. The Defendant also noted that this court had recognized that

> the better procedure where, as here, the defendant is charged with offenses involving the use of violence and force and also charged with the status offense of unlawful possession of a firearm for having a similar prior felony conviction would be to bifurcate the proceedings and address the unlawful possession of a firearm charge separately.

*State v. Foust*, 482 S.W.3d 20, 46-47 (Tenn. Crim. App. 2015) ("*Foust I*") (citations omitted).

The trial court addressed the Defendant's motion on the morning of trial. The prosecutor objected to bifurcation, argued that bifurcation was not required, and offered to enter into a stipulation. The following exchange occurred:

> [PROSECUTOR]: … And I'm not clear how the Court has couched that stipulation, but I believe it to be in terms of being convicted of a felony as related to the specific—

> THE COURT: Well, the cleanest way to do it is just everybody agree that he qualifies for a conviction—or his prior qualifying conviction fits the statutory criteria, and then you just set out that particular subsection of the statute and then that's put in the verdict form. They either find him guilty or not guilty of violating that subsection of the statute. And that's been upheld on appeal multiple times.

> ….

> THE COURT: That's the way I've always done it. The other option that I've always given … is that if a defendant such as someone in [the Defendant's] position wishes to plead guilty without a recommendation to the gun charge, I'll sever that and we'll just try the especially aggravated robbery. I don't know if you've had the discussion with him.

> I don't know how the facts are intertwined. I don't know if this is an identity defense. I don't know what the facts of this case are. So I don't know if that's even something that's a viable option for him.

Defense counsel again argued that this court had stated in multiple cases that bifurcation is the "better procedure." The trial court denied the Defendant's motion during the following exchange:

THE COURT: I'm going to leave them together. I'm going to leave them together because that's what the status of the law is. You know, this may be the case that they change their minds and say, no, we told you that the better way to do this is to bifurcate them, and you didn't do it, so—

[THE PROSECUTOR]: We're offering to stipulate.

THE COURT: All right. You need to speak with [the Defendant] and see—he's got two options. If he wishes to plead guilty to just the gun charge, I will permit a severance of that offense and allow his plea and the jury will never know that he admitted his guilt to that.

However, obviously, if this is an identity question, it may be that he can't do that without locking himself into being the perpetrator. So I don't know. I don't know anything about the facts of this case.

Secondly, if he doesn't want do to that, the other option is to do a stipulation and we'll just set out the statutory numbers, 1307 subpart whatever, whatever, that talks about crimes of violence, and they will never hear the words violence or know exactly what his prior conviction is. All they'll know is that he has a felony conviction that meets the criteria of that subsection of the statute. So if you would discuss that with him and we'll see where we are.

[THE PROSECUTOR]: If I could just read the proposed stipulation and see if that satisfies the Court. "For purposes of count two of the indictment, the parties stipulate that the defendant, Charles Griffin, prior to June 8, 2017, had been convicted of a prior felony as described in TCA 39-17-1307."

THE COURT: That's the way I've done it—

[THE PROSECUTOR]: That's straight out of [State v.] Richardson, actually, Judge.

THE COURT: That's the way I've done it multiple times in this—in this type situation. It's been upheld on appeal every single time. So that

way they never find out what the nature, or even that it's a crime of violence, all they know is that it's a felony conviction that meets the criteria of that subsection.

So talk to [the Defendant], and let us know what you're going to do, and we'll start picking a jury. I've still got to do some pleas, so it's probably going to be about another half hour before we start picking a jury.

[DEFENSE COUNSEL]: Thank you, your Honor.

During the trial, the parties entered into a stipulation that provided, "For purposes of count two of the indictment, the parties stipulate that the defendant, Charles Griffin, prior to June 8th, 2017, had been convicted of a prior felony as described in TCA 39-17-1307(b)(1)(A)." The stipulation was signed by the prosecutor, defense counsel, and the Defendant. After the stipulation was read to the jury, the trial court instructed the jury that "the fact that Mr. Griffin has been previously convicted of another crime in no way impairs his presumption of innocence in this case."

This court has noted that bifurcation is "the better procedure" when "the defendant is charged with offenses involving the use of violence and force and also charged with the status offense of unlawful possession of a firearm for having a similar prior felony conviction." *Foust I*, 482 S.W.3d at 46-47. Furthermore, this court has recognized that a trial court may order bifurcation upon concluding that a bifurcated proceeding is "necessary 'in order to avoid undue prejudice.'" *State v. Brandon Johnson*, No. W018-01222-CCA-R3-CD, 2019 WL 6045569, at *13 (Tenn. Crim. App. Nov. 14, 2019), *perm. app. denied* (Tenn. Apr. 1, 2020) (quoting *State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009)). Nevertheless, this court has continued to hold that bifurcation is not mandated. *See id*; *State v. Tavares Dewayne Buchanan*, No. M2017-02268-CCA-R3-CD, 2019 WL 852192, at *6 (Tenn. Crim. App. Feb. 21, 2019), *perm. app. denied* (Tenn. Apr. 11, 2019); *State v. Stephan Richardson*, No. W2016-02227-CCA-R3-CD, 2018 WL 821775, at *16 (Tenn. Crim. App. Feb. 9, 2018); *State v. Timothy Damon Carter*, No. M2014-01532-CCA-R3-CD, 2016 WL 7799281, at *27 (Tenn. Crim. App. Mar. 8, 2016), *overruled on other grounds by State v. Menke*, 590 S.W.3d 455, 468 (Tenn. 2019).

Furthermore, the parties entered into a stipulation at trial. "[S]tipulating to prior felonies and requesting bifurcated proceedings are both valid avenues for a defendant charged with possession of a firearm as a convicted felon." *Brandon Johnson*, 2019 WL 6045569, at *14 (citing *State v. Carlos Smith*, No. W2012-01931-CCA-R3-CD, 2013 WL 12182606, at *4 (Tenn. Crim. App. Aug. 29, 2013)); *see Stephan Richardson*, 2018 WL 821775, at *16.

- 11 -

The Defendant contends that the stipulation was the result of duress and relies upon this court's recent opinion in *State v. Benjamin Foust* ("*Foust II*"), E2017-02420-CCA-R3-CD, 2019 WL 3824028, at *11-15 (Tenn. Crim. App. Aug. 15, 2019), *no perm. app. filed*. In *Foust II*, the trial court denied the defendant's request to bifurcate the proceedings when the defendant was charged with both offenses involving the use of violence and force and with the status offense of unlawful possession of a firearm while having a similar prior felony conviction. *Id.* at *13-14. The trial court informed the defendant that he could either plead guilty to the firearm offenses, enter into a stipulation, or permit the State to introduce evidence of the defendant's prior violent felony convictions in its case-in-chief. *Id.* at *14. The defendant objected to entering into a stipulation and to entering into a guilty plea. *Id.* Thereafter, the trial court instructed the parties to enter into a stipulation and provided them with the language to use. In concluding that the stipulation was not a valid agreement entered into mutually and voluntarily by the parties, this court reasoned:

> The trial court did not merely suggest that the parties enter into a stipulation and then allow the parties to reach an agreement regarding the wording of the stipulation. Rather, the trial court's actions were tantamount to an order of the court, and the stipulation was not a result of a mutual agreement reached by the parties. The lack of mutuality to the stipulation was illustrated by the prosecutor's confusion and request for clarification from the trial court regarding its instruction, as well as defense counsel's continued objection to the procedure.

*Id.*

In the present case, the prosecutor was the first person to mention a stipulation while arguing against bifurcation and offered to enter into a stipulation. In denying the Defendant's motion, the trial court stated that the Defendant's other options included pleading guilty to the firearm offense or entering into a stipulation. The trial court stated that it was unaware of the facts of the case and, thus, did not know whether a guilty plea was a viable option. Based upon discussions with the trial court, the prosecutor drafted the language of the stipulation in the event that the Defendant agreed to enter into one. The trial court made it clear that it was the Defendant's decision regarding what option to use and instructed defense counsel to talk to the Defendant about what he wanted to do in light of the trial court's denial of the bifurcation request. The hearing ended with the trial court allowing defense counsel the opportunity to confer with the Defendant in order to make a decision. The Defendant never objected to entering into a stipulation, and the stipulation entered into evidence at trial was signed by the prosecutor, defense counsel, and the Defendant. Unlike the trial court in *Foust II*, the trial court in this case never ordered the parties to enter into a stipulation. Rather, the record reflects that the

stipulation was entered into mutually and voluntarily by the parties. *See Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 701 (Tenn. Ct. App. 1999) (defining a stipulation as an agreement "which is entered into mutually and voluntarily by the parties").

The stipulation entered into by the parties provided that the Defendant had a prior felony conviction "as described in TCA 39-17-1307(b)(1)(A)." The jury never heard that the Defendant had prior convictions for aggravated assault, aggravated robbery, robbery, armed robbery, and possession of a firearm by a convicted felon. The stipulation did not describe the prior felony convictions as involving force, violence, or a deadly weapon, and the language of the trial court's jury instructions on the firearm charge were consistent with the language in the stipulation. Finally, after the stipulation was read to the jury, the trial court instructed the jury that the fact that the Defendant had a prior criminal conviction did not impair his presumption of innocence. Accordingly, we conclude that the Defendant is not entitled to relief regarding this issue.

## CONCLUSION

Upon reviewing the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE